1   KAMALA D. HARRIS, State Bar No. 146672
    Attorney General of California
2   TRACY S. HENDRICKSON, State Bar No. 155081
    Supervising Deputy Attorney General
3   RORY D. ALLEN, State Bar No. 279905
    Deputy Attorney General
4     1300 I Street, Suite 125
      P.O. Box 944255
5     Sacramento, CA 94244-2550
      Telephone:  (916) 324-5470
6     Fax:  (916) 324-5205
      E-mail:  Rory.Allen@doj.ca.gov
7   *Attorneys for Defendants*
    *W. Westin, J. Smith, D. Nelson, and E. Callison*

8

IN THE UNITED STATES DISTRICT COURT

9

FOR THE EASTERN DISTRICT OF CALIFORNIA

10

SACRAMENTO DIVISION

11

12

13   **TAI HUYNH,**                          2:09-cv-01979 CKD

14                          Plaintiff,        **MEMORANDUM OF POINTS AND
                                              AUTHORITIES IN SUPPORT OF
15           v.                               DEFENDANTS' MOTION FOR
                                              SUMMARY JUDGMENT**
16
     **SUSAN HUBBARD, ET AL.,**
17
                            Defendants.
18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

INTRODUCTION .................................................................................................... 1

STATEMENT OF FACTS ...................................................................................... 1

STANDARD ON SUMMARY JUDGMENT ......................................................... 7

ARGUMENT ......................................................................................................... 8

I. The Court Should Grant This Motion Because The Undisputed Evidence Shows That Defendants Were Not Deliberately Indifferent to an Excessive Risk to Plaintiff's Health ................................................................ 8

    A. Defendant Callison Cannot Be Held Liable Under The Eighth Amendment Because MTAS Were Not Conducting Medication Rounds On The Majority Of Days Plaintiff Alleges That He Missed Doses ................................................... 9

    B. Defendants Smith, Nelson, And Weston Cannot Be Held Liable Under The Eighth Amendment Because They Lacked Authority To Administer Medication Or Force Medical Staff To Act. .................................................. 10

    C. Defendants Are Entitled To Summary Judgment Because The "Current Attitudes And Conduct" Of Prison Authorities Do Not Demonstrate Deliberate Indifference ................................................................................ 11

II. The Court Should Grant This Motion Because, Even If Plaintiff Had Missed Doses Of TB Medication, He Is At No Greater Risk Of Developing Active TB Or Drug-Resistant TB .................................................................. 11

III. Plaintiff May Not Engineer His Own Eighth Amendment Injury And His Own Personal Decisions Are Responsible For His Perceived Injury ............ 12

IV. Plaintiff Lacks Standing To Maintain This Lawsuit Because It Is Undisputed That He Suffered No Injury As A Result Of Defendants' Conduct. ............... 13

V. Defendants Are Entitled To Qualified Immunity Because They Violated None Of Plaintiff's Constitutional Rights And Their Conduct Was Objectively Reasonable. .. 14

CONCLUSION ..................................................................................................... 16

i

**TABLE OF AUTHORITIES**

Page

CASES

*Abromson v. American Pac. Corp.*
114 F.3d 898 (9th Cir. 1997) ............................................................................. 8

*Broughton v. Cutter Laboratories*
622 F.2d 458 (9th Cir. 1980) ............................................................................. 9

*Browning v. Vernon*
44 F.3d 818 (9th Cir. 1995) ............................................................................. 14

*Celotex Corp. v. Catrett*
477 U.S. 317 (1986) .................................................................................... 7, 8

*Estelle v. Gamble*
429 U.S. 97 (1976) ......................................................................................... 9

*Farmer v. Brennan*
511 U.S. 825 (1994) ....................................................................................... 8

*Gibson v. County of Washoe, Nevada*
290 F.3d 1175 (9th Cir. 2002) ......................................................................... 8

*Halet v. Wend Inv. Co.*
672 F.2d 1305 (9th Cir. Cal. 1982) ................................................................. 13

*Harlow v. Fitzgerald*
457 U.S. 800 (1982) ..................................................................................... 14

*Helling v. McKinney*
509 U.S. 25 (1993) ............................................................................... 9, 11, 12

*Jeffers v. Gomez*
267 F.3d 895 (9th Cir. 2001) ......................................................................... 14

*Johnson v. Duffy*
588 F.2d 740 (9th Cir. 1978) ......................................................................... 10

*Leer v. Murphy*
844 F.2d 628 (9th Cir. 1988) ......................................................................... 10

*Lujan v. Defenders of Wildlife*
504 U.S. 555 (1992) ..................................................................................... 13

*Lujan v. National Wildlife Fed'n*
497 U.S. 871 (1990) ....................................................................................... 8

# TABLE OF AUTHORITIES
**(continued)**

**Page**

*Malley v. Briggs*
   475 U.S. 335 (1986) ..................................................................................... 14

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*
   475 U.S. 574 (1986) ....................................................................................... 8

*McGuckin v. Smith*
   974 F.2d 1050, 1059 (9th Cir. 1991) ........................................................... 8

*Oliver v. Keller*
   289 F.3d 623 (9th 2002) ............................................................................. 11

*Pearson v. Callahan*
   555 U.S. 223 (2009) ............................................................................. 14, 15

*Rodriquez v. Briley*
   403 F.3d 952 (7th Cir. 2005) ..................................................................... 12

*Saucier v. Katz*
   533 U.S. 194 (2001) ............................................................................. 14, 15

*Scott v. Dist. of Columbia*
   139 F.3d 940 (D.C.Cir. 1998) .................................................................... 11

*Talib v. Gilley*
   138 F.3d 211 (5th Cir. 1998) ................................................................. 12, 13

*Toguchi v. Chung*
   391 F.3d 1051 (9th Cir. 2004) ..................................................................... 8

*Wilson v. Seiter*
   501 U.S. 294 (1991) ...................................................................................... 8

*Wood v. Housewright*
   900 F.2d 1332 (9th Cir. 1990) ...................................................................... 9

*Zatler v. Wainwright*
   802 F.2d 397 (11th Cir. 1986) .................................................................... 10

**STATUTES**

42 United States Code
   § 1983 ........................................................................................................... 1

# TABLE OF AUTHORITIES
### (continued)

Page

**CONSTITUTIONAL PROVISIONS**

Eighth Amendment ................................................................................................ passim

U.S. Constitution, Article III ........................................................................................ 13

**COURT RULES**

Federal Rule of Civil Procedure, 56(c) ....................................................................... 7, 8

**INTRODUCTION**

Plaintiff, Tai Huynh (T-42770), filed this 42 U.S.C. § 1983 action, alleging that Defendants Westin, Smith, Nelson, and Callison were deliberately indifferent to his serious medical needs by failing to provide him with numerous doses of his tuberculosis (TB) medication. As a result of this allegedly irregular treatment, Plaintiff alleges that he is at a greater risk of developing either active TB or drug-resistant TB.

The Court should grant this motion because the undisputed facts show that Plaintiff did not miss doses of TB medication, Defendants were not responsible for any missed doses, and even if Plaintiff had missed the alleged doses, ha has not suffered any harm, and he is not at a greater risk of developing active TB or drug-resistant TB. Thus, Plaintiff's Eighth Amendment claim fails. Finally, Defendants' conduct did not violate the Eighth Amendment, thus they are entitled to qualified immunity.

**STATEMENT OF FACTS**

Between April and October 2006, Plaintiff was incarcerated at High Desert State Prison (HDSP). (Defendants' Undisputed Facts (DUF), Fact 1.) At all time relevant to this action Defendants Nelson, Smith, and Westin were employed as correctional officers at HDSP. (DUF 2.) At all times relevant to this action Defendant Callison was a Medical Technician Assistant (MTA) at HDSP. (DUF 3.)

In April 2006, Plaintiff was prescribed TB medication twice weekly, on Tuesdays and Thursdays. (DUF 4 .) Plaintiff alleges that MTAs failed to deliver a total of 16 doses of TB medication to his cell on: April 25 and 27; "nearly the entire month of May of 2006"; June 1, 13, and 15; July 20; October 12, 19, and 24 of 2006. (DUF 5-6.) Plaintiff was housed in Facility D, Building 6 between April and October 2006. (DUF 9.) Plaintiff was a general population inmate during this time. (DUF 10.)

Correctional officers are not responsible for administering or delivering medication. (DUF 11.) In normal circumstances, a general population inmate must visit the pill line to obtain TB medication. (DUF 12.) During some lockdowns, or if an inmate is in administrative segregation, or if an inmate is mobility impaired, MTAs will deliver medications to cells. (DUF 13.)

1

1   However, not all lockdowns initiate MTA rounds.  (DUF 14.)  During some lockdowns inmate

2   are still permitted to attend the pill line but there may be restrictions, such as escorts to sick call.

3   (*Id*.)  These decisions are made by the warden of HDSP and recorded in the Part-B PSR.  (DUF

4   15.)

5       Lockdown HDP-D-05-019 affected Asians and Pacific Islanders on Facility D.  This

6   lockdown ended, and the affected inmates were returned to normal program, on April 19, 2006.

7   (DUF 16.)  On May 25, 2006, lockdown HDP-D-06-17 affected all inmates in Facility D,

8   Buildings 5 and 6.  This lockdown ended, and the affected inmates were returned to normal

9   program, on May 31, 2006.  (DUF 17.)

10      On June 16, 2006, lockdown HDP-D-06-020 affected all inmates in Facility D Buildings 1-

11  6.  (DUF 18.)  The PSR for HDP-D-06-020 ordered that inmates be escorted to sick call.  The

12  PSR did not initiate MTA rounds in the units.  (DUF 19.)  This lockdown ended, and the affected

13  inmates were returned to normal program, on July 26, 2006.  (*Id*.)  On October 11, 2006,

14  lockdown HDP-D-06-031 affected all Asian and Pacific Islander inmates in Facility D Buildings

15  1-6.  (DUF 20.)  The PSR for HDP-D-06-031 initiated MTA rounds in the affected unit.  (DUF

16  22.)

17      Plaintiff was not on lock down, and MTAs were not delivering in-cell medication, when

18  Plaintiff alleges he missed doses on April 25 or 27; May 2, 4, 9, 11, 16, 18, or 23; or June 1, 13,

19  or 15.  (DUF 23-25.)  Plaintiff was on lockdown on July 20, however, according to Part-B PSR

20  for HDP-D-06-020 inmates were to be escorted to sick call and there were no MTA rounds in the

21  units.  (DUF 26.)  Plaintiff was on lockdown on October 12, 19, and 24, according to the Part-B

22  PSR for HDP-06-031, MTAs were ordered to make medication rounds in the units during this

23  lockdown.  (DUF  27.)

24      MTAs were not delivering in-cell medication on April 25 or 27; May 2, 4, 9, 11, 16, 18, or

25  23; June 1, 13, or 15; or July 20.  (DUF 28.)  MTAs were responsible for delivering medication to

26  Plaintiff in his cell on only five days that Plaintiff alleges he missed doses of TB medication (May

27  25, 30 and October 12, 19, 24, 2006).  Plaintiff does not allege that he missed any doses in

28  August or September 2006, the two months before he began refusing further treatment.  (DUF 8.)

2

TB is a disease, primarily of the lungs, caused by a bacterium called *Mycobacterium tuberculosis*. (DUF 29.) Two TB-related conditions exist: latent TB and active TB disease. (DUF 30.) Most people exposed to TB bacteria are able to fight the bacteria and prevent active growth of the bacteria. Patients with latent TB are not infectious and cannot spread the bacteria to others. There is an approximate 5-10 % probability that a patient with untreated latent TB will develop an active infection during their lifetime. (DUF 31.) The greatest chance of developing an active TB infection is within the first two years of the initial exposure. (*Id.*) There is a 5-2.5% probability that a patient infected with TB will develop active TB within two years of the initial exposure. (DUF 32.) After the initial two year period of greatest danger, there is a 0.1 % probability that a patient with latent TB will develop active TB each subsequent year. After the initial two-year period of greatest danger, there is a 5-2.5 % probability that a patient with latent TB will develop an active infection during the rest of his or her lifetime. (*Id.*)

TB becomes active if the immune system cannot stop the bacteria from multiplying. (DUF 33.) Patients with active TB will show symptoms and are contagious. Most patients with latent TB never develop active TB. (*Id.*)

Under the CDCR's TB evaluation program, all inmates in the custody of CDCR are required to be evaluated for TB. (DUF 34.) The most common test for infection is the TB skin test (TST). (DUF 35.) A positive result occurs when immune cells react to the TB protein. A positive result can occur if someone is currently infected with TB, if they are infected with atypical mycobacteria, or if they previously received a BCG vaccine. A TST cannot differentiate between active or latent TB. (*Id.*)

Once an inmate has a positive TST they are commonly given a chest x-ray to determine whether the patient has an active infection. (DUF 36.) The California penal code and CDCR regulations require either treatment of inmates with active TB or compulsory respiratory isolation. (DUF 37.) Patients with latent TB may develop an active infection at some time in the future, therefore, it is recommended that they agree to treatment. (*Id.*)

Prisoners without a prior positive TST in their medical history are classified as "Code 22," meaning they have no history of a positive TST. (DUF 38.) Code 22 inmates are administered a

TST once a year. (*Id.*) California prisoners who have previously been diagnosed with TB are designated as "Code 32". Code 32 inmates do not receive further TST's. (DUF 39.)

Common medicine treatments for TB include a nine month regimen of treatment. Isoniazid (INH) is a common TB treatment drug. (DUF 40.) The serious side effects of INH include: an allergic reaction; unusual weakness or fatigue; nausea; vomiting; loss of appetite; abdominal pain; yellow skin or eyes; dark urine; numbness or tingling hands or feet; seizures; blurred vision; or confusion or abnormal behavior. (DUF 41.)

The treatment of active TB and latent TB differs significantly. The treatment for latent TB is typically a regimen of a single medication. (DUF 43.) The initial treatment for active TB is a regimen of a combination of four or more medications; TB is always treated with two or more drugs. (*Id.*)

It is important that patients with an active infection finish the treatment and take the drugs exactly as prescribed. (DUF 44.) Patients with active TB have a risk of developing drug-resistant strains of bacteria if they are administered only a single drug, or stop treatment early. (*Id.*) There must be an ongoing disease process to develop drug-resistant TB. (DUF 45.) When a patient has active TB the bacteria is actively multiplying. Each time one of the bacterium multiplies there is a random chance that the new bacterium will result in a mutation. Occasionally, a mutation will result in a drug-resistant version. (*Id.*) If a patient with active TB stops taking the medication too soon, some of the multiplying bacteria may survive, and this may result in a predominance of TB strains that are resistant to the medication. (DUF 46.) Patients with active infections may stop taking medication early because they typically begin to feel better after four weeks of treatment. (DUF 47.) The use of a single medication would have the undesired effect of artificially selecting for the resistant mutations because the resistant mutations will have a survival advantage over the sensitive strains. (DUF 48.) Because active TB is treated with a combination of medications, when patients terminate the treatment prematurely there is a risk of developing the more serious multi-drug-resistant TB (MDR TB). (DUF 49.)

The risk of developing drug-resistant TB exists only in patients with active TB. (DUF 50.) The treatment for patients with latent TB is preventive, meaning it is intended to prevent

4

reactivation of the bacteria. (DUF 51.) Patients with latent TB do not have an ongoing disease process, and the bacteria are inactive, meaning the bacterium is not multiplying. (DUF 52.) There is a 0% probability that an incomplete INH treatment of latent TB will cause the development of a drug-resistant strain because the bacteria are not multiplying. (DUF 53.) Without multiplication there can be no random mutations of a resistant strain. (*Id*.) Because there is no multiplication, latent TB can be safety treated with a single medication, such as INH. (DUF 54.)

Missing doses of INH for treatment of latent TB does not increase the risk of developing active TB. (DUF 55.) An incomplete INH regimen can be corrected by completing a new latent TB infection treatment regimen. (DUF 56.) A patient with latent TB who fails to complete a nine-month treatment regimen can be safely and effectively treated with a subsequent complete regimen. If a patient with latent TB is unable to complete treatment, the proper course of action is to begin and complete a new treatment regimen. (*Id*.)

On January 29, 2006, Plaintiff had a chest x-ray to check for active TB. (DUF 57.) According to the notes of Dr. Goller, Plaintiff had a previous positive PPD skin test. The result of the chest x-ray was negative for active TB disease. (*Id.*)

On April 13, 2006, Plaintiff signed a consent form for a course of latent TB drug treatment. (DUF 58.) The form indicates that he took TB medication for an unknown length of time in Santa Clara County in 1990. (*Id*.) On April 14, 2006, a physician at HDSP ordered a nine month regimen of INH and vitamin B6. (DUF 59.)

On April 27, 2006, Plaintiff met with Dr. Cox for a follow up appointment and review of the INH treatment. (DUF 60.) Dr. Cox noted that Plaintiff was currently prescribed INH and B6 for a positive PPD test. Plaintiff denied any side effects or shortness of breath. Dr. Cox checked Plaintiff's lungs and noted that they sounded "clear with no rales, wheezes, or rhonchi" (rattling). Dr. Cox noted that he was prescribed INH and B6 for a nine-month regimen for TB prophylaxis (latent TB treatment). Dr. Cox recommended that Plaintiff continue the medication regimen as prescribed. Dr. Cox did not note any missing INH doses or complaints of incomplete treatment. (*Id*.)

5

On April 30, 2006, Plaintiff had a second chest x-ray which was also negative for active TB disease. (DUF 61.)

On June 12, 2006, Plaintiff met with Dr. Cox for a follow-up appointment and review of the INH treatment. (DUF 62.) Dr. Cox noted that Plaintiff was currently taking INH and B6, and noted no side effects, and that Plaintiff's lungs sounded clear. Dr. Cox encouraged Plaintiff to continue the INH and B6 treatment regimen. Dr. Cox did not note any missing INH doses or complaints of incomplete treatment. (*Id.*)

On August 28, 2006, Plaintiff met with Dr. James for a follow up appointment and review of the INH treatment. (DUF 63.) Dr. James noted that Plaintiff was in the middle of a course of treatment of INH and B6. Plaintiff reported that "once in a while after a dose of INH I will get a little vertigo." Dr. James noted that this vertigo was not consistent or reproducible. Plaintiff's chest sounds were normal with no "wheezing, rales, or rhonchi". Dr. James discussed the possibility of tests and medical devices for exercise induced asthma. Dr. James did not note any missing doses of INH or complaints of incomplete treatment. (*Id.*)

Plaintiff's Medical Administration Report (MAR) indicates that he was receiving INH 300 mg and B6 50 mg twice weekly from April 18, 2006 until January 12, 2007. (DUF 64.) Plaintiff refused medication on October 24, 2006, and the public health nurse was notified. (DUF 65.) Plaintiff refused medication again on October 31st, November 2nd and 7th. Plaintiff did not accept any further INH or complete the prescribed treatment. (*Id.*)

On November 7, 2006, HDSP staff, Callison and Hackworth signed a refusal-to-sign form for Plaintiff's refusal of treatment with INH and B6. (DUF 66.)

On November 14, 2006, public health nurse Roach met with Plaintiff. (DUF 67.) Nurse Roach offered to continue medication or have Plaintiff sign a refusal form. Nurse Roach noted that the inmate refused to sign and stated "I don't want to continue taking the medication, I missed doses and I don't want to end up with multi drug-resistant TB." (*Id.*) On the same date nurse Miller noted that Plaintiff had declined further INH treatment. (DUF 68.) On the same day Snyder, the healthcare appeals coordinator at HDSP, noted that Plaintiff refused to sign a refusal of preventative TB drug treatment form. (DUF 69.)

6

Plaintiff's TB score was re-evaluated on March 10, 2007, April 28, 2008, April 27, 2009, March 3, 2010, October 11, 2010, and April 18, 2012. (DUF 70.) On April 18, 2012, Plaintiff declined further preventative TB treatment because he was not sure if it was a good idea to retake the medication. (DUF 71.)

On September 10, 2007, and January 22, 2009, Plaintiff's lung sounds were clear, without wheezes, rales, or rhonchi. (DUF 72.) On October 8, 2010, April 15, 2011, and April 18, 2012 Plaintiff had no symptoms for active TB. (DUF 73.)

Plaintiff has never been diagnosed with active TB. (DUF 74.) Plaintiff was exposed to TB as early as 1989-1992, while at the Santa Barbara County Juvenile Detention Center. (DUF 75.) Plaintiff's greatest risk of developing active TB was two years after his initial exposure to the bacteria, or in 1991-1993. (*Id*.) Plaintiff now has a 5-2.5 % probability of developing an active TB infection during his lifetime. (DUF 76.) This risk could be eliminated if he accepted an offer to complete treatment. (*Id*.)

Plaintiff did not have active TB when he was treated for TB in 2006. (DUF 77.) Without an active disease process there is a 0 % probability that Plaintiff could develop drug-resistant TB. (DUF 78.) Furthermore, there is a 0 % probability that Plaintiff could develop MDR TB because he was only treated with a single TB medication. (DUF 79.) Plaintiff has never been diagnosed with drug-resistant TB. (DUF 80.) Therefore, even if the allegations were true, they would not place Plaintiff at greater risk for active TB or drug-resistant TB. (DUF 81.)

Defendants never acted with the intent to injure Plaintiff, or acted with knowledge that their actions or inaction would, or were likely to, cause Plaintiff injury. (DUF 82.)

## STANDARD ON SUMMARY JUDGMENT

Summary judgment is appropriate when it is demonstrated that there exists no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. Rule 56(c). The moving party has the initial burden of identifying relevant portions of the record that demonstrate the absence of a fact or facts necessary for one or more essential elements of each cause of action upon which the moving party seeks judgment. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

If the moving party has sustained its burden, the nonmoving party must then identify specific facts, drawn from materials on file, that demonstrate that there is a dispute as to material facts on the elements that the moving party has contested.  Fed. R. Civ. P. 56(c).  The nonmoving party may not simply rely on the pleadings and must do more than make "conclusory allegations [in] an affidavit." *Lujan v. National Wildlife Fed'n*, 497 U.S. 871, 888 (1990); *see also Celotex Corp.,* 477 U.S. at 324.

Summary judgment must be granted if the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex,* 477 U.S. at 322; *Abromson v. American Pac. Corp.,* 114 F.3d 898, 902 (9th Cir. 1997).  Summary judgment for the moving party is proper when a rational trier of fact would not be able to find for the nonmoving party on the claims at issue.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986).

**ARGUMENT**

**I.**   **THE COURT SHOULD GRANT THIS MOTION BECAUSE THE UNDISPUTED EVIDENCE SHOWS THAT DEFENDANTS WERE NOT DELIBERATELY INDIFFERENT TO AN EXCESSIVE RISK TO PLAINTIFF'S HEALTH.**

A prison official acts with deliberate indifference, in violation of the Eighth Amendment, only if he knows of and disregards an excessive risk to inmate health or safety.  *Gibson v. County of Washoe, Nevada*, 290 F.3d 1175, 1187 (9th Cir. 2002).  "Deliberate indifference is a high legal standard." *Toguchi v. Chung*, 391 F.3d 1051, 1060 (9th Cir. 2004).  A prison official violates the Eighth Amendment only when both an objective and a subjective prong are satisfied.  First, the alleged deprivation must be, in objective terms, "sufficiently serious." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (citing *Wilson v. Seiter*, 501 U.S. 294, 298 (1991)).  Second, the prison official must act with a "sufficiently culpable state of mind," which requires more than mere negligence, but less than conduct undertaken for the very purpose of causing harm.  *Farmer*, 511 U.S. at 837.  A prison official does not act in a deliberately indifferent manner unless the official "knows of and disregards an excessive risk to inmate health or safety." *Id.*  Deliberate indifference may be manifested "when prison officials deny, delay or intentionally interfere with medical treatment." *McGuckin v. Smith*, 974 F.2d 1050, 1059 (9th Cir. 1991).

8

The Ninth Circuit has held that before it can be said that a prisoner's civil rights have been abridged, "the indifference to his medical needs must be substantial. Mere 'indifference,' or 'negligence,' will not support this cause of action." *Broughton v. Cutter Laboratories*, 622 F.2d 458, 460 (9th Cir. 1980) (citing *Estelle v. Gamble,* 429 U.S. 97, 105-06 (1976)). Even gross negligence is insufficient to establish deliberate indifference to serious medical needs. *Wood v. Housewright*, 900 F.2d 1332, 1334 (9th Cir. 1990).

In *Helling v. McKinney*, the Supreme Court established the standards for a "future injury" claim under the Eighth Amendment. *Helling v. McKinney*, 509 U.S. 25 (1993). In *Helling*, a prisoner alleged that exposure to environmental tobacco smoke (ETS) violated his Eighth Amendment rights. The Supreme Court held that, under the objective standard, the plaintiff had the burden to show that the "the risk that the prisoner complains of to be so grave that it violates contemporary standards of decency to expose anyone unwillingly to such a risk"— and that "the prisoner must show that the risk of which he complains is not one that today's society chooses to tolerate." *Id*. at 35. Plaintiff must present proof of exposure to unreasonably high levels of risk. *Id*. "More than mere scientific and statistical inquiry into the seriousness of the potential harm and the likelihood that such injury to health will be caused by exposure to ETS" is necessary to establish the objective component. *Id*. The Supreme Court held that the subjective factor, "should be determined in light of the prison authorities' current attitudes and conduct." *Id.* at 36. In fact the Supreme Court noted that "[i]ndeed, the [subsequent] adoption of the smoking policy … will bear heavily on the inquiry into deliberate indifference." *Id*.

A.   **Defendant Callison Cannot Be Held Liable Under The Eighth Amendment Because MTAs Were Not Conducting Medication Rounds On The Majority Of Days Plaintiff Alleges That He Missed Doses.**

As a MTA, Callison, would have been responsible for delivering medication to Plaintiff's cell on only five of the sixteen days Plaintiff alleges that he missed his medication. Plaintiff was prescribed TB medication for nine months, twice weekly, on Tuesdays and Thursdays. (DUF 4.) In normal circumstances, inmates must visit the pill line to obtain medication such as TB medication. (DUF 12.) MTAs will deliver medications to cells during some lockdowns. (DUF

9

13.) However, during some lockdowns and modified programs, inmates are still permitted to attend the pill line. (DUF 15.)

Plaintiff alleges that he missed doses of TB medication on April 25 and 27; nearly the entire month of May of 2006; June 1, 13, and 15; July 20; October 12, 19, and 24 of 2006. (DUF 5.) There were no MTA medication rounds on April 25, 27; May 2, 4, 9, 11, 16, 18, 23; June 1, 13, 15; July 20; or October 12, 19. (DUF 28.) During these days, it was Plaintiff's responsibility to attend the pill line. (DUF 12.) MTAs were only responsible for in-cell delivery during the alleged missed-doses on May 25, 30, and October 12, 19, and 24, 2006. (DUF 28.) Accordingly, MTAs would have been responsible for only five alleged missed doses in a regimen of seventy-eight scheduled doses. Therefore, Plaintiff, not Callison would be responsible for the majority of the alleged missed doses. Plaintiff's MAR indicates that he received his TB medication on every scheduled day until he refused further treatment. (DUF 84.) Callison never acted with the intent to injure Plaintiff, or acted with knowledge that his actions, or inaction, would, or were likely to, cause Plaintiff injury. (DUF 82.)

### B. Defendants Smith, Nelson, And Weston Cannot Be Held Liable Under The Eighth Amendment Because They Lacked Authority To Administer Medication Or Force Medical Staff To Act.

To establish liability under the Eighth Amendment, a defendant's indifference must be shown to be "the actual and proximate cause" of the harm. *Leer v. Murphy*, 844 F.2d 628, 634 (9th Cir. 1988) (citing *Zatler v. Wainwright*, 802 F.2d 397, 400-01 (11th Cir. 1986). The court's inquiry must focus on the defendants' duties, discretion, and means to prevent the abuse. *Id.*, 844 F.2d at 633-34; *Johnson v. Duffy*, 588 F.2d 740, 743 (9th Cir. 1978).

Here, the Eighth Amendment claims against the correction officer defendants are untenable. It is undisputed that Defendants Nelson, Smith, and Weston lacked authority to administer medication or override the decisions of medical staff. (DUF 11.) Correctional officers Nelson, Smith, and Weston were not responsible for administering medications and were not permitted to administer medication. (*Id.*) Plaintiff alleges that the attempts of custody staff to call the clinic regarding missed doses were unsuccessful. (DUF 7.) Dr. Cox did not note any complaints of missed doses on April 27, 2006, or June 12, 2006. (DUF 60 and 62.) Dr. James did not note any

10

complaints of missed doses on August 28, 2006. (DUF 63.) Plaintiff refused doses on October 24, 31, and November 2, and 7, 2006. (DUF 65.) Plaintiff's own refusal to accept further medication caused him to miss scheduled doses between November 2006 and January 2007. (DUF 65-69.) Plaintiff refused further offers to complete TB treatment. (DUF 71) Defendants never acted with the intent to injure Plaintiff, or acted with knowledge that their actions, or inaction, would, or were likely to, cause Plaintiff injury. (DUF 83.) Defendants were not the actual or proximate cause of Plaintiff's alleged injury, therefore, they are entitled to summary judgment.

### C. Defendants Are Entitled to Summary Judgment Because The "Current Attitudes and Conduct" Of Prison Authorities Do Not Demonstrate Deliberate Indifference.

Under *Helling*, "the subjective factor, deliberate indifference, should be determined in light of the prison authorities' current attitudes and conduct..." *Helling*, 509 U.S. at 36. The Court is permitted to consider subsequent actions and attempts to address the risks, indeed the Supreme Court noted that the subsequent change in policy may bear heavily on the deliberate indifference standard. *Id.* Even imperfect efforts to address or correct the risk do not raise to the level of deliberate indifference when prison officials make a good faith effort. *Scott v. Dist. of Columbia*, 139 F.3d 940, 942-44 (D.C.Cir. 1998) (imperfect enforcement of non-smoking policy did not demonstrate deliberate indifference). The current conduct and attitude do not demonstrate deliberate indifference. CDCR has a policy to test, track, and treat patients who have previously tested positive for TB. (DUF 37-39.) Defendants are not responsible for his current treatment or health, Plaintiff is no longer housed a HDSP. (DUF 83.) CDCR staff offered to complete Plaintiff's treatment in 2006. (DUF 65-69.) And, CDCR staff has continued to offer TB treatment, which Plaintiff has refused. (DUF 71.) CDCR has monitored Plaintiff's health annually since 2006. (DUF 70.) Therefore, Defendants are entitled to summary judgment.

### II. THE COURT SHOULD GRANT THIS MOTION BECAUSE, EVEN IF PLAINTIFF HAD MISSED DOSES OF TB MEDICATION, HE IS AT NO GREATER RISK OF DEVELOPING ACTIVE TB OR DRUG-RESISTANT TB.

To prevail on a deliberate indifference claim a plaintiff's injury must be more than de minimis. *Oliver v. Keller*, 289 F.3d 623 (9th 2002). The evidence shows that Plaintiff has

11

suffered no injury and is at no greater risk of developing active TB or multi-drug resistant TB. Plaintiff has never been diagnosed with active TB or drug-resistant TB. (DUF 74 and 80.) Plaintiff did not have active TB when he began preventative TB treatment in 2006. (DUF 77.) There is a 0 % chance that an incomplete INH treatment of a patient with latent TB will cause the development of a drug-resistant TB because the bacteria are not multiplying. (DUF 53.) Missing doses of latent TB INH treatment does not increase the risk of developing active TB. (DUF 55.) A patient with latent TB who fails to complete a nine-month regimen can be safely and effectively treated with a subsequent nine-month regimen. (DUF 56.) Even if Plaintiff's allegations were true, and he missed 16 doses, Plaintiff would not be at greater risk of developing active TB or multi-drug resistant TB. (DUF 81.) Therefore, Defendants are entitled to summary judgment because Plaintiff suffered no injury or illness and is at no greater risk for future illness.

In *Helling*, the Supreme Court expressed doubt that the plaintiff could meet the objective standard and show that he was exposed to an unreasonably high risk, because "he has been moved to a new prison and no longer has a cellmate who smokes, and since a new state prison policy restricts smoking to certain areas and makes reasonable efforts to respect nonsmokers' wishes with regard to double bunking." *Helling*, 509 U.S. at 26. Similarly, Plaintiff is no longer housed a HDSP. (DUF 83.) Defendants are not responsible for his current treatment or health. CDCR staff offered to complete Plaintiff's treatment in 2006. (DUF 65-69.) CDCR has monitored Plaintiff's health annually since 2006. (DUF 70.) CDCR staff has continued to offer TB treatment, which Plaintiff has refused. (DUF 71.) Therefore, Defendants are entitled to summary judgment.

### III.  PLAINTIFF MAY NOT ENGINEER HIS OWN EIGHTH AMENDMENT INJURY AND HIS OWN PERSONAL DECISIONS ARE RESPONSIBLE FOR HIS PERCEIVED INJURY.

Prisoners cannot be permitted to "engineer an Eighth Amendment violation." *Rodriguez v. Briley*, 403 F.3d 952, 953 (7th Cir. 2005) (inmate's refusal to comply with prison policy was reason he was deprived of 75 showers and 350 meals in an 18-month period.) Similarly in *Talib v. Gilley*, the Fifth Circuit found no Eighth Amendment violation where an inmate was denied meals because he refused to comply with in-cell feeding measures. *Talib v. Gilley*, 138 F.3d 211

(5th Cir. 1998). The inmate was denied approximately fifty meals over a span of five months because he would not assume the proper position. *Id.* at 212. The *Talib* court ruled that because it was the inmate's "personal decision," no violation of the Eighth Amendment had been established. *Id.* at 216.

Similarly, it is Plaintiff's own "personal decision" that has created any present risk. A patient with latent TB has a 5-2.5 % chance to develop active TB over their lifetime, after the first two years of initial exposure. (DUF 32.) Missed doses of INH do not increase the risk of active TB or drug-resistant TB. (DUF 55.) An incomplete treatment can be effectively and successful followed by a subsequent complete treatment. (DUF 56.) Plaintiff refused further treatment three months prior to the scheduled completion. (DUF 59 and 65.) CDCR officials made multiple efforts to continue the treatment. (DUF 66-69 and 71.) CDCR officials made offers, at a different prison, to restart treatment, which Plaintiff decided to refuse. (DUF 71.) Plaintiff cannot engineer his own Eighth Amendment claim, claiming that Defendants placed him at risk of future illness – and simultaneously refusing preventative treatment that would eliminate that perceived risk. It was Plaintiff's personal decision to end the original treatment three months early, therefore there can be no violation of the Eighth Amendment. Additionally, it was Plaintiff's personal decision to refuse offers to complete the treatment and subsequent preventative treatment, therefore there can be no violation of the Eighth Amendment. Plaintiff cannot have it both ways, both sue for unsatisfactory treatment and continue to refuse treatment.

## IV. PLAINTIFF LACKS STANDING TO MAINTAIN THIS LAWSUIT BECAUSE IT IS UNDISPUTED THAT HE SUFFERED NO INJURY AS A RESULT OF DEFENDANTS' CONDUCT.

Plaintiff lacks standing to maintain this action because he suffered no injury as a result of Defendants' conduct. The U.S. Constitution requires that, to demonstrate standing, the party be injured by the challenged conduct. U.S. Const. art. III.; *Halet v. Wend Inv. Co.*, 672 F.2d 1305, 1308 (9th Cir. Cal. 1982); *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (standing is an indispensable part of the plaintiff's case). Plaintiff has never developed active TB or drug-resistant TB. (DUF 74 and 80.) Even if Plaintiff's allegations were true, and he missed doses of

///

13

his preventative TB treatment, he is at no greater risk of either developing active TB or drug-resistant TB.  (DUF 81.)  Therefore, summary judgment should be entered in Defendants' favor.

**V.     DEFENDANTS ARE ENTITLED TO QUALIFIED IMMUNITY BECAUSE THEY VIOLATED NONE OF PLAINTIFF'S CONSTITUTIONAL RIGHTS AND THEIR CONDUCT WAS OBJECTIVELY REASONABLE.**

The defense of qualified immunity protects "government officials . . .  from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  Qualified immunity is intended to permit prison officials to undertake their responsibilities without fear that they will be held liable for damages for actions that appeared rational at the time, but are later held to violate constitutional rights. *Id.* at 819. Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

In *Saucier v. Katz*, 533 U.S. 194, 201 (2001), the Court set forth a two-part analysis for ruling on qualified immunity. First, "[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right? . . . If no constitutional right would have been violated were the allegations established, there is no necessity for further inquires concerning qualified immunity." *Id.* If a constitutional violation could be established, the court must determine whether the right was clearly established. *Id.*  If the right was clearly established at the time of the incident, the court must then determine whether, "under that law, could a reasonable state official have believed his conduct was unlawful?" *Id.* at 202; *Jeffers v. Gomez*, 267 F.3d 895, 910 (9th Cir. 2001) (quoting *Browning v. Vernon*, 44 F.3d 818, 822 (9th Cir. 1995)).

The two-pronged *Saucier* test is not mandatory, but its application is beneficial.  *Pearson v. Callahan*, 555 U.S. 223, 235 (2009).  *Pearson* concluded that district courts and the courts of appeals "should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in the light of the circumstances in the particular case at hand. *Id.  Pearson* simply allows the district court

/ / /

14

1  discretion to decide whether the two-pronged analysis is worthwhile in a particular case.  *Id.* at

2  241.

3       The Court, here, should analyze both prongs of *Saucier* because Defendants did not violate

4  Plaintiff's Eighth Amendment rights.  Plaintiff has never developed active TB or drug-resistant

5  TB.  (DUF 81.)  Missing doses of INH for treatment of latent TB does not increase the risk of

6  developing active TB or drug-resistant TB.  (DUF 53 and 55.)  Assuming that missing doses did

7  violate Plaintiff's constitutional rights, Defendants are nonetheless entitled to qualified immunity

8  under the second prong of *Saucier*.  MTAs were not responsible for delivering medication on

9  April 25 or 27; May 2, 4, 9, 11, 16, 18, or 23; June 1, 13, or 15; or July 20.  (DUF 28.)  MTAs

10  were responsible for delivering medication to Plaintiff in his cell on only five days that Plaintiff

11  alleges he missed doses of TB medication (May 25, 30 and October 12, 19, 24, 2006).  (*Id.*)

12  Defendants Weston, Smith, and Nelson, were unable to deliver or administer medication.  (DUF

13  11.)  Plaintiff refused further TB medication on October 24, 31; November 2, 7.  (DUF 65.)

14  Plaintiff's own refusal caused him to miss scheduled doses in November and December 2006, and

15  January 2007.  (DUF 59 and 65-69.)  Plaintiff refused further offers to complete TB treatment.

16  (DUF 71.)  Defendants never acted with the intent to injure Plaintiff, or acted with knowledge

17  that their actions or inaction would, or were likely to, cause Plaintiff injury.  (DUF 82.)

18  / / /

19  / / /

20  / / /

21

22

23

24

25

26

27

28

15

**CONCLUSION**

Defendants were not responsible for the vast majority of the alleged missed doses of TB. Plaintiff was not on lockdown, and therefore responsible to attending the pill line, during 13 of the alleged 18 missed doses. Even if Plaintiff had missed significant doses of TB medication he is at no greater risk of developing active TB or drug resistant TB. Finally, Defendants are entitled to qualified immunity. Accordingly, the Court should grant this motion and enter judgment in favor of Defendants.

Dated: August 21, 2013                                    Respectfully submitted,

KAMALA D. HARRIS
Attorney General of California
TRACY S. HENDRICKSON
Supervising Deputy Attorney General


*/s/ Rory D. Allen*

RORY D. ALLEN
Deputy Attorney General
*Attorneys for Defendants*
*W. Westin, J. Smith, D. Nelson, and*
*E. Callison*

SA2012305526
31697875.doc